UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAVERN LOCK

             Plaintiff,                     CIVIL ACTION NO. 05-CV-73474-DT

      vs.                            DISTRICT JUDGE DENISE PAGE HOOD

COMMISSIONER OF                  MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

             Defendant.
_____/

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 14), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 13), and that Plaintiff's Complaint be **DISMISSED**.

II.     PROCEDURAL HISTORY

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Lavern Lock filed an application for Disability Insurance Benefits (DIB) in March 2002. (Tr. 44-46). She alleged she had been disabled since September 21, 1999. (Tr. 53,

276-78). Plaintiff's claims were initially denied in June 2002. (Tr. 26). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 32-35). A hearing took place before ALJ Roderic Anderson on February 10, 2004. (Tr. 267-303). Plaintiff was represented by an attorney at the hearing. (Tr. 42-43, 267). The ALJ denied Plaintiff's claims in an opinion issued on May 22, 2004. (Tr. 13-23). The Appeals Council denied review of the ALJ's decision on July 26, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 4-6). Plaintiff appealed the denial of her claims to this Court, and both parties have filed motions for summary judgment.

III.     **MEDICAL HISTORY**

In 1993 or 1994 Plaintiff was diagnosed with carpal tunnel syndrome ("CTS") and had surgery on her left hand. (Tr. 104, 135). On September 21, 1999 Dr. Abdelmajid I. Jondy sent a letter to Plaintiff's employer in which he noted permanent restrictions for Plaintiff's return to work due to her CTS. These restrictions included no air guns, vibrating or power hand tools; no direct palm pressure, no repetitive twisting or bending of the hands or wrists, no screw insertion, limited use of both hands, and no lifting of more than 10 pounds. (Def.'s Mot. for Summ.J. at 4).[1]

---

[1]     Defendant notes that this letter was part of a separate claim file pertaining to Plaintiff. It was discussed by the ALJ and Plaintiff's attorney at the hearing but it does not appear in the record. (Tr. 301-02). The parties do not dispute the contents of the letter. Plaintiff does not assert that there is any other information in the separate claim file relevant to this appeal that it not part of the record.

In April or May 2001 Plaintiff underwent surgery on her right hand for CTS. Dr. Jondy examined Plaintiff in December 2001. She complained of bilateral numbness and weakness in her hands, especially under cold conditions. Dr. Jondy's examination confirmed that Plaintiff had a weak grip with poor discrimination. (Tr. 127). By January 2002 Plaintiff had an improved grip. The numbness and tingling in her hands had improved. *Id.* However, Dr. Jondy noted that Plaintiff had a "recurrent fear" and could not work for two months. *Id.* In February 2002 Dr. Jondy commented that Plaintiff had stiffness and aching especially in her left index finger. He noted that she could wash her walls at home but had to stop after 3 hours. Vacuuming and washing dishes was problematic. However, Plaintiff had a full range of motion and good grip. Dr. Jondy noted that Plaintiff could not work. (Tr. 126).

Dr. Jondy filled out a disability statement on March 25, 2002 indicating that Plaintiff had recurrent left CTS and that she was unable to work until April 29, 2002. He noted that Plaintiff had stiffness, edema, and a weak grip and that she was only able to perform her own personal care and house care. He opined that Plaintiff could not work any available jobs. (Tr. 120, 126).

Plaintiff saw Dr. Jondy again in May 2002 when she complained of pain, swelling and tenderness in her right hand following a fight. (Tr. 125). Tenderness was found in Plaintiff's 5th metacarpal upon pressure and motion. *Id.* An x-ray was negative for a fracture. *Id.*

On May 14, 2002 Dr. Samiullan Sayyid performed a consultative examination of Plaintiff. Plaintiff told Dr. Sayyid that her chief medical complaint at the time was her weight gain. She said that post-surgery she still had pain, tingling, and numbness in the thenar eminence of both

hands.  Dr. Sayyid noted that while Plaintiff had previously taken Tylenol #3 and #4 for her pain, she was currently only taking over-the-counter Tylenol.  An examination revealed that Plaintiff was alert, awake, and oriented.  She had intact sensation except for paresthesia of the fingertips in both hands.  Her reflexes, spine, and gait were normal.  Plaintiff could not do rapid alternating hand movements on either side.  However, she had 5/5 muscle strength, tone, and bulk as well as a full range of motion in both upper and lower extremities.  Plaintiff's fine and gross dexterity in both upper extremities were normal but her grip was reduced to a 4/5.  (Tr. 104-06).

Dr. R.H. Digby, a state agency medical consultant, completed a Physical Residual Functional Capacity ("RFC") form on May 31, 2002.  Dr. Dibgy opined that Plaintiff was capable of: (1) lifting and/or carrying 10 pounds occasionally and less than 10 pounds frequently; (2) standing and/or walking for 6 hours (with normal breaks) out of an 8-hour workday; (3) sitting for 6 hours (with normal breaks) out of an 8-hour workday; (4) frequently climbing ramps/stairs, balancing, stooping, kneeling, and crouching; and (5) occasionally climbing ladders/scaffolds and crawling.  Dr. Digby also found that Plaintiff was limited in her ability to push and/or pull with her upper extremities, reach in all directions, use her hands for gross and fine manipulation, and feel with her hands but that she could frequently use both hands for handling and fingering.  Dr. Digby further determined that Plaintiff should avoid hand powered tools or any other hand vibration.  (Tr. 110-17).

Plaintiff's complaints of pain in her right hand continued in July and August 2002. (Tr. 124, 128). In September 2002 Dr. Jondy examined Plaintiff who reported that she had pain and locking of her right 5th trigger finger for the past 2-3 months. She was taking Tylenol. An examination showed tenderness, palpable thickness, and pulling of the tendons in Plaintiff's right 5th trigger finger as well as bilateral grip weakness. (Tr. 123). Dr. Jondy recommended a right 5th trigger finger release. *Id.* Dr. Jondy performed the release in October 2002. (Tr. 118, 129). Follow-up records indicate that Plaintiff's hand had healed but that she had traumatized the wound when washing dishes. (Tr. 121). The wound had re-healed by late October 2002. Plaintiff had a full range of motion and no tenderness. She was placed off of work for 1 month. (Tr. 118).

Plaintiff also saw a new doctor in October 2002 for a complete physical. She complained of a headache that had begun about 6 months previously for which Aleve provided temporary relief. (Tr. 181). A routine mammogram was ordered. *Id.* The results of the mammogram and a subsequent biopsy revealed that Plaintiff had cancer in her left breast. (Tr. 135-36).

Plaintiff met with by Dr. Raouf A. Mikhail in December 2002 to discuss the treatment options for her breast cancer. (Tr. 135-36). At that time, Plaintiff denied having any bone pain or muscle weakness. (Tr. 135). She also denied having any psychological problems. (Tr. 136). Dr. Mikhail noted on December 17, 2002 that Plaintiff had elected to have a partial mastectomy. *Id.*

Plaintiff underwent a partial mastectomy and sentinel node and axillary dissections on January 15, 2003. (Tr. 137). Mild cellulitis of the breast wound was noted on January 21, 2003. Plaintiff was given a prescription for Keflex. Plaintiff had discontinued using Darvocet because it caused blurred vision. She was instead prescribed Tylenol #3 with no refills. *Id.*

Plaintiff began chemotherapy in February 2003. (Tr. 137, 158, 255-60). Plaintiff's oncologist, Dr. Rizwan Danish, noted that Plaintiff reported fatigue in March 2003 but was tolerating the therapy reasonably well. (Tr. 257). In April 2003 Dr. Danish noted that Plaintiff was still doing well but she had complaints of sore mouth, diarrhea, fatigue, and mucositis. She also had difficulty eating solid foods. (Tr. 256). Dr. Danish therefore changed Plaintiff's treatment. He also prescribed Xanax for anxiety. *Id.* On May 5, 2003 Dr. Danish reported that Plaintiff had worsening mucositis and he decided to decrease the dosage of her chemotherapy. (Tr. 255).

Plaintiff was seen by Dr. Jondy on May 16, 2003. Dr. Jondy noted that Plaintiff had a full range of motion in her right hand but that her hand showed considerable discoloration due to the chemotherapy. He concluded that Plaintiff was totally and permanently disabled. (Tr. 119).

Plaintiff subsequently ended chemotherapy in November 2003. Radiation therapy ensued. (Tr. 137).

Plaintiff was evaluated at a cancer institute's oncologic psychology department on January 9, 2004. (Tr. 246-52). Plaintiff reported that she had recurrent depression, dating back 8 years to the time of her divorce. She had previously attended individual and group therapy

-6-

and took Zoloft.  She further stated that her depression had been at its worst in the past 9 months and that her current primary stressor was her cancer.  She was taking Effexor but she did not believe that it helped.  Her sleep was disturbed and her appetite fluctuated.  Plaintiff also reported impaired concentration, lack of energy, and isolation but she denied any suicidal thoughts.  (Tr. 246).  The psychologist noted that Plaintiff appeared sad and that she had a mildly flat affect.  (Tr. 250).  Plaintiff had normal interview behavior, thought control and process, orientation, and speech.  She also had insight and was of average intelligence.  *Id.* However, the psychologist noted that Plaintiff had mild motor retardation and mild memory cloudiness.  *Id.*  The psychologist diagnosed Plaintiff with recurrent and moderate major depressive disorder.  He also assigned her a Global Assessment of Functioning ("GAF") score of 55.[2]  The psychologist recommended 6 months of weekly treatment sessions.  (Tr. 252).

   The psychologist's progress notes from late January 2004 indicated that Plaintiff's mood the previous week had been reportedly depressed and irritable.  (Tr. 253).  She isolated herself a lot in her room.  *Id.*  She said that she was angry at herself for missing her medical appointments and that her current stressor was her sister who was not contributing financially

---

   [2]   The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed., text rev. 2000) at 32-34 ("DSM-IV").  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* A GAF rating of 51 to 60 signals the existence of a moderate difficulty in social or occupational functioning.  *Id.* at 34.

toward the household expenses. *Id.* Plaintiff further stated that her sleep had improved somewhat. The psychologist noted that Plaintiff was continuing to respond to her depressed mood with isolation and conflict avoidance. Plaintiff's primary goal was to work on resolving her problems with her sister. *Id.*

A few days later, Plaintiff met with Dr. Danish for a follow-up appointment. Dr. Danish reported that Plaintiff experienced mild discomfort as a result of her radiation therapy but was otherwise doing well. (Tr. 254). He opined that Plaintiff was in clinical remission and prescribed Tamoxifen as continued treatment. *Id.*

IV.   **HEARING TESTIMONY**

    A.    **Plaintiff's Testimony**

Plaintiff was 46 years old when she appeared before the ALJ. (Tr. 272). She testified that she had completed her high school education. (Tr. 273). Plaintiff told the ALJ that she had stopped working due to her CTS and that her condition had worsened because she was now in more pain. (Tr. 274, 278). She described the pain in both her hands as extending up her arms to her shoulders and spreading into her wrists. (Tr. 279). She also testified that she took daily medication to treat her breast cancer, which made her dizzy, tired, restless, and fatigued. *Id.* Plaintiff stated that she did not sleep well and that she slept for about an hour and a half before waking up from pain or depression. (Tr. 280-81). She also testified that she took two to three naps during the day for about 45 minutes each. (Tr. 281). Plaintiff further indicated that to relieve her pain, she sat sideways or rocked. (Tr. 283). When asked about

her depression, Plaintiff testified that she was being treated by Dr. Jeffrey Porter, a psychiatrist, since November 2003. (Tr. 292). Her depression made her "mostly cry." (Tr. 293). She stated that she took Effexor for her depression, which sometimes helped. *Id.*

Plaintiff testified that she could only sit, stand, or walk for 30-45 minutes due to back pain. (Tr. 282). She stated that she could lift between 20 to 25 pounds with two hands. (Tr. 282, 283). Plaintiff further informed the ALJ that she had problems bending, squatting, pushing, pulling, reaching overhead, holding onto objects, opening jars, and gripping pots and pans.

When asked about her daily activities, Plaintiff stated that she stayed in bed all day and slept. She indicated that she did not belong to any clubs or social organizations. Plaintiff testified that she went grocery shopping "every now and then" but needed the help of her niece to carry and pick up the groceries. (Tr. 279-80). Plaintiff's friends attended to the yard work and her niece did the housework although Plaintiff still folded the laundry. Plaintiff clarified that she used to do laundry, dusting, and dishes. (Tr. 280, 282). Plaintiff also told the ALJ that she had a driver's license but that she did not drive very often. (Tr. 275). She had driven to the hearing and she would drive to her medical appointments or to her niece's school. *Id.*

### B.   Vocational Expert's Testimony

Mr. Timothy Shaner, a certified rehabilitation counselor, testified as a vocational

-9-

expert at the hearing. (Tr. 37, 296-302). The ALJ asked Mr. Shaner about the type and number of jobs available in Michigan for a hypothetical individual of Plaintiff's age, education, and work experience[3] who was capable of performing unskilled, light work with the following limitations: (1) no climbing ladders or crawling; (2) no gripping or grasping wrist movements; (3) no use of air or vibrating tools; (4) no repetitive use of the hands; and (5) only occasional handling, fingering and feeling. (Tr. 298-99).

Mr. Shaner testified that the hypothetical individual described by the ALJ could perform a number of jobs at the sedentary to light level, including 6,000 unskilled childcare worker positions, 1,000 usher positions, or 3,000 gate guards positions, which were available in the lower peninsula of Michigan. (Tr. 299).

Mr. Shaner further testified that the jobs he described would not be available to the same hypothetical worker if that individual was unable to be relieved of her chronic pain, fatigue, and medication, was unable to sustain the concentration, persistence, and pace on a continuing basis as necessary to complete the required tasks of a regular 40 hour-per-week job, and who required: (1) no prolonged walking, standing, or sitting; (2) a sit/stand option; (3) no repetitive pushing or pulling; (4) no climbing of stairs or ladders; (5) no repetitive

---

[3]        Mr. Shaner had previously submitted a vocational analysis form indicating that Plaintiff's prior work as a production assembler was categorized as medium, unskilled work. This form was made part of the record during the hearing. (Tr. 96, 297-98)

bending, twisting, or turning; (6) no reaching above the shoulders and head bilaterally; and (7) frequent napping, resting or reclining as needed. (Tr. 299).[4]

## V.   THE ALJ'S FINDINGS

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 21, 1999. (Tr. 22). He further found that Plaintiff's CTS was severe but that it did not meet or medically equal a listed severe impairment. (Tr. 19). The ALJ also surmised that Plaintiff could not perform her past relevant work but that she retained the RFC to perform unskilled, light work that incorporated no climbing of stairs or use of ladders, no crawling, no repetitive gripping or grasping wrist movements, no use of air or vibrating tools, no repetitive use of hands, and only occasional handling, fingering, and feeling. (Tr. 20, 22). Plaintiff's claim was denied because the ALJ determined that, based upon the testimony of Mr. Shaner, there were other jobs available in the economy for a person of Plaintiff's age, educational level, work experience, and RFC. (Tr. 20-22, 23). Furthermore, the ALJ determined that Plaintiff's allegations about her limitations were not totally credible. (Tr. 22).

---

[4]    Mr. Shaner also testified that Plaintiff would not be able to perform her past, relevant work if the ALJ credited Plaintiff's claims regarding her limitations. (Tr. 298).

-11-

VI.   <u>LAW AND ANALYSIS</u>

A.   <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

-12-

**B.   FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)   he was not presently engaged in substantial gainful employment; and

(2)   he suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

-13-

C.   <u>ANALYSIS</u>

Plaintiff asserts that the hypothetical posed by the ALJ was inaccurate and, therefore, that the VE's testimony does not support the ALJ's disability determination.  Specifically, Plaintiff asserts that the ALJ's hypothetical failed to account for the opinions of Dr. Jondy and Dr. Digby who stated that Plaintiff should not be required to lift more than 10 pounds. Plaintiff also asserts that the ALJ erred in finding that her depression was not severe, which consequently resulted in an inaccurate hypothetical to the VE.  For the reasons stated below, the court concludes that Plaintiff has failed to demonstrate that the ALJ erred in the manner alleged.

The Commissioner of Social Security generally gives "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2).  The Commissioner will give the opinion of a treating physician controlling weight, if the opinion is well-supported and not inconsistent with the other substantial evidence. *Id.* When the opinion of the treating physician is not given controlling weight, factors such as the length of the treatment relationship, nature and extent of the treatment relationship, and the supportability of the physician's opinion will be considered in determining how much weight to afford the opinion. *Id.* The regulations also require the ALJ to give "good reasons in our notice of determination or decision for the

-14-

weight ... give[n] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); see also SSR 96-5p.

Furthermore, the findings made by program physicians and psychologists regarding an individual's impairments, including RFC, are treated as expert opinion evidence of nonexamining sources. See SSR 96-6p, 1996 WL 374180, at *1. The "rule[] in 20 CFR 404.1527(f) . . . require[s] administrative law judges and the Appeals Council to consider [the consultant's findings of fact] about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists." *Id. at *2.* Furthermore, an ALJ "must explain the weight given to the [consultant's] opinions in their decisions. *Id.*

In his written opinion, the ALJ did not ignore the opinion of Dr. Jondy. Indeed, the ALJ summarized Dr. Jondy's report in which he imposed the 10-pound weight limitation. (Tr. 18). He also discussed at length the insurance forms filled out by Dr. Jondy, wherein he found Plaintiff totally disabled, and stated his reasons for rejecting those opinions.[5] (Tr. 18, 20). The ALJ also implicitly incorporated Dr. Digby's opinion regarding Plaintiff's ability to sit/stand/walk and her various postural, manipulative and environmental limitations. However, the ALJ did not specifically discuss why he rejected the opinions of Dr. Jondy and Dr. Digby that Plaintiff cannot lift more than 10 pounds. Having failed to do so, it is clear that the ALJ failed to comply with the procedural requirements of 20 C.F.R.

---

[5]        Plaintiff does not challenge the ALJ's finding in this regard.

§§ 404.1527(d)(2) and 404.1527(f) as well as SSR 96-5p and 96-6p.

Defendant acknowledges that Dr. Jondy is a treating physician and that the ALJ did not specifically address why he rejected the opinions of Dr. Jondy and Dr. Digby regarding the 10-pound limitation. Defendant asserts, however, that the ALJ's omissions are harmless procedural errors under *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

The *Wilson* court did not decide whether a de minimis procedural violation, specifically that of the § 1527(d)(2), may qualify as harmless error, but noted instances in which it might: 1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2)--the provision of the procedural safeguard of reasons--even though she has not complied with the terms of the regulation." *Id.* at 547. The *Wilson* Court made it clear, however, that a violation is not harmless simply because sufficient evidence otherwise exists to support the ALJ's decision. *Wilson*, 378 F.3d at 543-46.

There is certainly substantial evidence to support the ALJ's ultimate conclusion in this case that Plaintiff is capable carrying/lifting 20 pounds on an occasional basis as required by the definition of light work. Plaintiff in fact testified at the hearing that she could lift between 20 to 25 pounds after examination by her attorney. *See* 20 C.F.R. § 404.1529

(claimant's own statements about her limitations are considered as evidence by the ALJ);

*Vega v. Callahan*, 975 F.Supp. 1372, 1376 (D. Or. 1997).  Furthermore, the medical records

also show that although Plaintiff had a reduced grip, she had normal fine and gross dexterity

in her upper extremities and full muscle strength.  Furthermore, Dr. Jondy's opinion,

subsequently relied upon by Dr. Digby, was rendered in 1999, and preceded Plaintiff's CTS

surgery on her right hand.

A review of the record also shows that the ALJ, while not noting his rationale in his

written opinion, nevertheless provided Plaintiff with adequate notice of his intentions at the

hearing, which provides this Court with an opportunity to conduct a meaningful review.

At the conclusion of the hearing, the ALJ and Plaintiff's attorney discussed Dr.

Jondy's opinion.  The ALJ stated:

> Now what – I think you ought to take into cognizance, when you're
> addressing this later on, is although these say she can lift only ten
> pounds. [*sic*] She herself said she can lift 20 pounds to 25 pounds.  So [*sic*]
> and she does have dexterity as you're aware.

(Tr. 302).  The ALJ further notes,

> So in the five years, or four years that has transpired, there may have
> been some change, not only in her wrists [*sic*] ability, I mean not only in
> the medical history that she's just given us, but also in her wrist history.
> Which I think you should take cognizance of, so that when you're
> developing your written final argument.[*sic*]

-17-

*Id.* Based upon this discussion, and the existence of substantial evidence to otherwise support the ALJ's RFC determination, the Court concludes that the ALJ's failure to discuss the opinions of Dr. Jondy and Dr. Digby that Plaintiff cannot lift more than 10 pounds, is harmless. *See Nelson v. Comm'r of Soc. Sec.*, 2006 WL 2472910 * 8-9 (6th Cir. 2006) (finding that the ALJ implicitly met the goal of § 1527(d)(2)--the provision of the procedural safeguard of reasons and relying upon *Wilson*, 378 F.3d 541 and *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456 (6th Cir. 2005)) .

Plaintiff also claims that the ALJ erred by finding that she did not suffer from a severe mental impairment despite her diagnosis of recurrent and moderate major depression and GAF score of 55 as determined by the psychologist at the oncology center.

The Act defines a non-severe impairment as an impairment or combination of impairments that "does not significantly limit . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. The clinical findings are referred to as the "A" criteria. Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area.  Thus, the Commissioner must evaluate deficits in activities of daily living and social functioning and rate those on a five-point scale ranging from none, mild, moderate, marked, and extreme.  Limitations in a third area of concentration, persistence, or pace are rated on the same five-point scale. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  20 C.F.R. § 404.1520a(c).  The regulations state that if "we rate the degree of your limitations in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) are not severe. . . ."  20 C.F.R. § 404.1520a(d)(1).

Furthermore, as Defendant notes, the agency's severity criteria in the Listings for mental disorders do not have a direct correlation with the GAF scale. Therefore, a scale determination is not dispositive and is to be considered as part of the entirety of the relevant evidence. 65 Fed.Reg. 50746-01, 50764-65 (2000).

Plaintiff's contention that the ALJ provided no rationale for finding that she does not suffer from a "severe" mental impairment is belied by the record.  In accordance with § 404.1520a, cited to by the ALJ, the ALJ provided a detailed summarization of Plaintiff's diagnosis of major depressive disorder and GAF score of 55.  (Tr. 19).  Nevertheless, he

-19-

determined that Plaintiff had only mild restrictions of daily living, in maintaining social functioning, and in maintaining concentration, persistence and pace.  He also determined that there was no evidence of decompensation.  (Tr. 19).  In making these findings, the ALJ pointed to Plaintiff's ability to independently and effectively care for her own personal needs, prepare meals, perform household errands and appropriately maintain a residence. He also noted that Plaintiff got along well with family members and had the ability to initiate social contact with others and communicate clearly and effectively.  Further, the ALJ commented that Plaintiff had the ability to sustain attention sufficiently to complete tasks and household routines and activities that require short-term memory.  *Id.*  Based upon these facts, the ALJ determined that Plaintiff's mental impairment was not "severe."

These findings are supported by substantial evidence based upon a review of Plaintiff's daily activities as reported by Plaintiff and her friend.  (Tr. 79-91).  Moreover, the psychologist, although diagnosing her condition as moderate, described Plaintiff as having normal interview behavior, thought control and process, orientation, and speech with insight and average intelligence.  Plaintiff's flat affect, motor retardation and memory cloudiness were depicted as "mild."  The psychologist also reported that Plaintiff's original primary stressor was coping with her cancer.  Subsequently, Plaintiff's having to deal with her sister's lack of financial support became her most significant stressor.  The psychologist recommended weekly therapy.  There is no evidence of hospitalization.

Additionally, the record shows that Plaintiff was able to work part-time in October and November 2001. Plaintiff alleged that she stopped working due to her CTS, not her depression. (Tr. 17, 274). Plaintiff also did not report any psychological problems, past or present, to Dr. Mikhail in December 2002. Plaintiff stated that her depression became symptomatic in November 2003 but the record does not show that Plaintiff sought any mental health treatment other than medication for her "nerves" until January 2004. (Tr. 100). Plaintiff testified that her medication "sometimes" helped. (Tr. 293).

Plaintiff does not assert that the ALJ's recitation of facts was inaccurate or improper. Rather, Plaintiff contends that the ALJ's findings are contradicted by her testimony and behavior at the hearing. She cites to her testimony where she stated that she "stays at home the majority of the time, needs help from her niece to go grocery shopping, has friends take care of the yard work, and has her niece take care of her housework. She also notes that she broke down emotionally in the middle of the hearing such that the ALJ was going to take a recess for [her] to compose herself." (Pl.'s Mot. for Summ.J. at 8).

However, the ALJ found Plaintiff's testimony less than fully credible in light of the objective medical evidence and Plaintiff's previously reported daily activities. (Tr. 20, 280). Plaintiff does not attack this credibility determination, which is a finding that generally deserves special deference.[6] *See Beavers v. Secretary*, 577 F.2d 383 (6th Cir. 1978).

---

[6]     A review of the hearing transcript also shows that Plaintiff's emotional state was not attributable to a mental impairment but rather to frustration regarding her

-21-

Furthermore, the overriding question in this appeal is whether the ALJ's decision was supported by substantial evidence even in the face of evidence that could support a contrary finding. Based on a review of this record as a whole, it is evident that the ALJ's decision is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level pursuant to *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986), and should not be disturbed on appeal.[7]

## VII.   RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 14) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 13) should be **DENIED** and her Complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections

---

preparedness to discuss her breast cancer. (Tr. 295-96).

[7]   Having found the ALJ's RFC finding to be supported by substantial evidence, the Court also concludes that the hypothetical posed to the VE provided an accurate description of Plaintiff's exertional and non-exertional impairments. Therefore, the VE's testimony that there exist a significant numbers of jobs in the Michigan for someone of Plaintiff's age, vocational profile, education and RFC is sufficient evidence to support a finding that Plaintiff is not disabled. *Varley*, 820 F.2d at 779.

which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: December 20, 2006          s/ Mona K. Majzoub
                                  **MONA K. MAJZOUB**
                                  **UNITED STATES MAGISTRATE JUDGE**


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.


Dated: December 20, 2006          s/ Lisa C. Bartlett
                                  Courtroom Deputy


-23-